**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**STATE OF MINNESOTA**, *by and through its Attorney General Keith Ellison;*
    445 Minnesota St, St Paul, MN 55101

**MARY MORIARTY**, *in her official capacity as the Hennepin County Attorney*;
    300 South 6th St, A-1200, Minneapolis, MN 55487

**DREW EVANS**, *in his official capacity as Superintendent of the Minnesota Bureau of Criminal Apprehension;*
    1430 Maryland Ave E, St Paul, MN 55106

               *Plaintiffs,*
  **v.**

**U.S. DEPARTMENT OF JUSTICE**;
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

**U.S. DEPARTMENT OF HOMELAND SECURITY**;
    2707 Martin Luther King Jr. Ave SE, Washington, DC 20528-0485

**PAMELA BONDI**, *in her official capacity as Attorney General of the United States*;
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

**KRISTI NOEM**, *in her official capacity as Secretary of the U.S. Department of Homeland Security.*
    2707 Martin Luther King Jr. Ave SE, Washington, DC 20528-0485

               ***Defendants.***

Case No. 26-cv-_____

**COMPLAINT**

1) In December 2025, the U.S. Department of Homeland Security launched an immigration enforcement action in Minnesota called "Operation Metro Surge" (the "Surge").

-1-

Described by DHS as the largest immigration operation in the Department's history, the Surge deployed thousands of armed and masked federal agents on the streets of Minnesota.

2) The Surge had a profound effect on all of Minnesota, but its impacts were particularly acute in Hennepin County. It was there—during the course of three weeks in January 2026 and at the height of the Surge—that federal agents shot and killed two people on public streets and shot and wounded a third person at the threshold of his home. Renee Good and Alex Pretti lost their lives during the Surge, and Julio Cesar Sosa-Celis was wounded, all at the hands of federal agents deployed to Minnesota by Defendants.

3) These shootings are just three examples of the violent actions committed by federal agents in Minnesota during the Surge. Federal agents also carried out illegal stops, sweeps, arrests, and dangerous raids in sensitive public spaces. The Surge created widespread fear among Minnesota residents, both citizens and noncitizens. It caused hundreds of millions of dollars in economic harm. And it flooded Minnesota's federal courts with lawsuits challenging the unlawful detentions that resulted from the operation.

4) This lawsuit focuses on the three shooting incidents that occurred between January 7 and January 24, 2026, and the federal government's decision to block a state-level investigation into each incident. Carrying out their ordinary responsibilities, Minnesota authorities responded to the scene of each shooting to investigate. Because the shootings involved federal agents, state investigators expected federal cooperation, consistent with longstanding historical practices. At the scene of the first two incidents—the killing of Renee Good and the shooting of Julio Sosa-Celis—federal agents initially indicated that they would work with Minnesota authorities and share relevant information. State investigators thus began their work in reliance on that understanding.

5)      But in both cases, federal agents quickly reneged on their pledges to cooperate. Instead of sharing information, federal authorities took exclusive possession of evidence that had been collected, and they denied Minnesota investigators access to key information.

6)      At the scene of the third shooting—the killing of Alex Pretti—federal immigration officers physically blocked investigators of the Minnesota Bureau of Criminal Apprehension ("BCA") from accessing the scene.  That physical obstruction persisted even after state officials obtained a judicial warrant authorizing access to the scene.  As with the previous two shootings, federal authorities took exclusive control of evidence and refused state and local authorities access to even the most basic information related to the incident – such as the identities of the involved officers.

7)      The State of Minnesota has the authority and responsibility to protect against and address violence within its borders, including by prosecuting homicides, attempted homicides, and assaults.   That responsibility rests primarily with Minnesota's law enforcement and prosecutorial authorities—in this case, Plaintiffs—who must gather the evidence, evaluate the facts, and decide whether Minnesota criminal law was violated.  It is a core attribute of state sovereignty—and a duty owed to the people of Minnesota—that such investigations be thorough and based on all relevant evidence.

8)      For decades, federal and state authorities have cooperated in significant criminal investigations.  Before January 2026, when serious incidents occurred in Minnesota that affected both state and federal interests, state agents and federal investigators worked collaboratively: sharing information, coordinating investigative steps, and ensuring that both sovereigns had access to the evidence necessary to fulfill their respective responsibilities.   This included investigations of shootings by federal officers. That cooperation is not merely customary. It

-3-

reflects the basic structure of American federalism, under which the States retain primary authority to investigate and enforce violations of their own criminal laws.

9) Defendants' refusals to share evidence here did not arise from any case-specific investigative need. Instead, the breakdown in cooperation followed intervention by senior federal officials who directed that evidence would not be shared with Minnesota authorities, reflecting a broader policy or practice not to share evidence with Minnesota in Operation Metro Surge use-of-force investigations.

10) Faced with unprecedented noncooperation, Plaintiffs submitted formal requests to Defendant U.S. Department of Homeland Security ("DHS") and Defendant U.S. Department of Justice ("DOJ" or "Justice Department") seeking access to evidence. Those requests invoked DHS and DOJ's administrative procedures for evaluating requests for agency records and testimony for use in state proceedings.

11) Defendants' responses to those requests—indeed, by and large, their refusal to respond at all—confirm that the federal government has adopted a policy and practice of refusing Minnesota authorities access to investigative materials relating to uses of force by federal immigration officers deployed to Minnesota as part of Operation Metro Surge. That policy has deprived state investigators of timely access to evidence in federal custody that is directly relevant to their investigations of potential violations of Minnesota criminal law.

12) Plaintiffs State of Minnesota, by and through its Attorney General Keith Ellison ("State"); Mary F. Moriarty, in her capacity as Hennepin County Attorney ("HCAO"); and Drew Evans, in his capacity as Superintendent of the Minnesota Bureau of Criminal Apprehension ("BCA"), bring this action against the U.S. Department of Homeland Security and the U.S. Department of Justice to secure access to the evidence necessary to investigate these shooting

incidents and to ensure that the State of Minnesota can fulfill its sovereign duty to determine whether federal officers committed crimes within its borders.

13)     Plaintiffs seek declaratory and injunctive relief to set aside Defendants' unlawful policy of noncooperation and their resulting refusal to comply with the investigative demands of Minnesota authorities.  At stake is not only Plaintiffs' access to evidence central to these shootings but also a fundamental principle of our constitutional system: that the States retain the sovereign authority—and responsibility—to investigate crimes committed within their borders.

## JURISDICTION AND VENUE

14)     This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331.  Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).  Defendants are United States agencies or officers sued in their official capacities.  Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

15)     Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison, who is authorized to sue on the State's behalf, including on behalf of its citizens. Minn. Stat. § 8.01.

16)     Plaintiff Mary F. Moriarty is the Hennepin County Attorney.  In that capacity, she is vested with the power and authority of the State of Minnesota to bring all felony criminal cases in Hennepin County.  *See* Minn. Stat. § 388.051.  She brings this lawsuit in her official capacity.

17)     Plaintiff Drew Evans is the Superintendent of the BCA, which is a statutory division of the Minnesota Department of Public Safety, an agency within the Executive Branch

of the State of Minnesota's government.  He brings this lawsuit in his official capacity.  The BCA

assists criminal justice authorities in investigating crimes through forensic analysis and other law-

enforcement services, including use-of-deadly-force investigations.  *See* Minn. Stat. § 299C.03.

18)     Defendant U.S. Department of Homeland Security is a federal cabinet agency

within the Executive Branch of the United States government.  U.S. Immigration and Customs

Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") are agencies within the

Department of Homeland Security.   Homeland Security Investigations ("HSI") is a

subcomponent of ICE.

19)     Defendant Kristi Noem is the current Secretary of Homeland Security ("DHS")

and is charged with the supervision and management of all decisions and actions of DHS.

Defendant Noem is sued in her official capacity.[1]

20)     Defendant U.S. Department of Justice is a federal cabinet agency within the

Executive Branch of the United States government.  The United States Attorney's Office for the

District of Minnesota is the component of the Justice Department responsible for representing

the United States in federal prosecutions within that district.  The office is headed by the United

States Attorney for the District of Minnesota, who operates under the supervision and direction

of the Attorney General.  The Federal Bureau of Investigation ("FBI") is also an agency within

the Justice Department that operates under the supervision and direction of the Attorney General.

---

[1] President Trump recently announced that he is removing Ms. Noem from her position as
Secretary of Homeland Security, effective March 31, 2026.  Markwayne Mullin was confirmed
by the Senate as her successor on March 23, 2026.  Upon his assumption of the office, he will be
automatically substituted as a defendant in this litigation by operation of Federal Rule of Civil
Procedure 25(d).

21) Defendant Pamela Bondi is the Attorney General of the United States and the federal official in charge of the Justice Department. The Attorney General is sued in her official capacity.

## LEGAL BACKGROUND

### I. The State's Sovereign Authority to Investigate and Enforce Its Criminal Laws

22) Under the Constitution's system of federalism, the States retain primary sovereign authority to define and enforce criminal law. *See Heath v. Alabama*, 474 U.S. 82, 93 (1985) (citing Federalist No. 9). The Tenth Amendment has long been understood to protect the rights of states to exercise their "police powers" within their borders. *See United States v. Morrison*, 529 U.S. 598, 618–19 (2000).

23) The authority to investigate and prosecute criminal offenses lies at the core of those sovereign police powers. *See Commonwealth of Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (observing that "State prosecutions . . . have their most ancient roots in an 'inherent sovereignty'" belonging to the State). The Supreme Court has recognized that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618.

24) The State of Minnesota accordingly has both the authority and the duty to investigate potential crimes committed within its jurisdiction and to gather evidence necessary to enforce its laws. Plaintiffs are each vested with core aspects of that State authority.

## II. *Longstanding Cooperation Between Federal and State Authorities in Criminal Investigations*

25) Consistent with these long-standing principles of federalism, cooperation and evidence-sharing between federal law enforcement and state and local authorities has long been a routine and essential feature of criminal investigations in Minnesota, as in other states, where federal and state interests overlap. This intergovernmental cooperation allows federal investigators to conduct their important work, while at the same time allowing state and local investigators to do the work that the people of Minnesota require of them.

26) Cooperative state and federal investigations have been the historical practice in federal officer–involved shootings. For example, in November 2019, after a deputy U.S. Marshal shot a suspect at a gas station in St. Paul, the BCA led the investigation into the use of force by the federal agents, and state prosecutors handled related criminal cases against the suspect. Similarly, in June 2021, after two members of a U.S. Marshals task force shot and killed a suspect in the Uptown neighborhood of Minneapolis, the BCA led the investigation into this shooting, with the support and cooperation of federal authorities.

27) Cooperation has also been the norm in non-officer involved cases that implicate both state and federal interests. As one example, federal and state authorities cooperated after the murder and attempted murder of Minnesota state lawmakers in 2025. In that case, BCA and FBI agents conducted joint witness and subject interviews, shared physical evidence and other information, and met regularly and jointly with prosecutors. This collaboration led to both state and federal prosecutions, which are still ongoing. As another example, when a mass shooting occurred at the Church of the Anunciation in Minneapolis in August 2025, federal and state investigators collaborated in the immediate aftermath. Minnesota authorities then completed the investigation into this incident, with assistance from federal officers as needed.

28)     This cooperation goes in both directions.  In some cases, federal prosecutions benefit from the work and support of state investigators.  This was the case in September 2025, when a collaborative effort to share evidence led to federal charges against a suspect alleged to have threatened a federal judge.  In announcing the charges, the United States Attorney's Office for the District of Minnesota stated:

> This case is the result of an investigation conducted by the FBI, the Wayzata Police Department, and the Bureau of Criminal Apprehension, with assistance from the United States Marshals Service.  The U.S. Attorney's Office also thanks the Hennepin County Attorney's Office for its quick action and important partnership in this case.[2]

29)     Other examples include the successful federal RICO prosecutions, which spanned from 2023 to the present, of more than 50 alleged gang members in the Minneapolis area.  An array of local, state, and federal law enforcement agencies worked collaboratively to share information and evidence, as did prosecutors from both the U.S. Attorney's Office and the Hennepin County Attorney's Office, all with the purpose of supporting the federal prosecutions.[3]

30)     Federal investigators also routinely contribute to state-run investigations and operations, as in the case of Operation Safe Summer, a collaboration between an array of state and federal law enforcement agencies that has lasted for years and has led to many successful

---

[2] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. of Minn., Defendant Charged with Threatening to Murder a Federal Judge (Sept. 9, 2025), https://www.justice.gov/usao-mn/pr/defendant-charged-threatening-murder-federal-judge [https://www.hennepinattorney.org/-/media/cao/news/2026/20260320_doj-release-1.pdf?rev=ee4ef743f73d40b5ab3083c241ecc597&hash=9DC15494F6823D448AF28048AE50A342].

[3] *See* Press Release, DOJ, U.S. Attorney's Office – Dist. of Minn., Three Members of the Highs Street Gang Convicted of RICO Conspiracy and Premeditated Murder, April 23, 2025, https://www.justice.gov/usao-mn/pr/three-members-highs-street-gang-convicted-rico-conspiracy-and-premeditated-murder.

state level prosecutions.[4]   In another example, state and federal law enforcement agencies collaborate on the Behavioral Threat Assessment and Management ("BTAM") team, an evidence-based and systematic process to identify, inquire, assess, and manage potential threats.[5]   The BTAM collaboration has led to many successful state level law enforcement actions and prosecutions.

31)   Cooperation and evidence sharing is particularly important in the context of federal officer–involved violence occurring within Minnesota's borders.  To determine whether such conduct violates Minnesota criminal law, state and local authorities must obtain access to relevant witnesses, documents, and physical evidence—including from the federal government—in order to conduct a thorough investigation.  The State's ability to obtain such evidence—including evidence in the possession of federal agencies—is an essential component of Minnesota's sovereign authority to investigate crimes and enforce its criminal laws.

32)   Plaintiffs are well-equipped to handle sensitive investigative materials, including those shared by federal authorities.  Minnesota investigators conduct secure and careful investigations into serious incidents every day, including those involving law enforcement officers. They maintain appropriate safeguards for sensitive information, follow chain-of-custody procedures, and preserve evidence for potential use in criminal proceedings.  In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as

---

[4] *See* Louis Krauss, Agencies again team up in Minneapolis to Saturate Crime Hot Spots for 'Operation Safe Summer, MINN. STAR TRIB. (June 4, 2025), https://www.startribune.com/agencies-again-team-up-in-minneapolis-to-saturate-crime-hot-spots-for-operation-safe-summer/601366596 [https://www.hennepinattorney.org/-/media/cao/news/2026/20260318_agencies-team-up-strib.pdf?rev=3b1ce975d74b4828aa76341fa85b7a56&hash=8B8D5717FB7056905BDFEA7F1C8A22B7].
[5] *See* U.S. Dep't. of Homeland Security, *Behavioral Threat Assessment and Management*, https://www.dhs.gov/behavioral-threat-assessment-and-management.

nonpublic. Minn. Stat. § 13.82, Subd. 7. This statute also creates protections for witnesses who have legitimate fears for their safety. For all these reasons, there can be no legitimate concern that sharing evidence with Minnesota will compromise any federal investigation. Indeed, the federal government has routinely shared evidence with state and local authorities in cooperative investigations.

33) The longstanding practice of cooperation and evidence-sharing between federal and Minnesota law enforcement authorities broke down during DHS's Operation Metro Surge in Minnesota. The history of cooperation and access to federal evidence that Minnesota officials had relied on to investigate these shootings abruptly ended once federal leadership became involved. Defendants have since repeatedly declined to provide Minnesota authorities access to evidence germane to the investigations into the shootings of Ms. Good, Mr. Pretti, and Mr. Sosa-Celis. These departures from established practice marked a significant breakdown in the longstanding pattern of cooperation between federal and state authorities in investigations involving potential criminal conduct within Minnesota, including in instances of federal officer-involved conduct.

### III. Defendants' *Touhy* Regulations Governing Formal Requests for Agency Records and Testimony

34) After federal officials stated they would not share evidence with State authorities, Plaintiffs submitted formal requests via Defendants' *Touhy* procedures.

35) Many federal agencies, including DOJ and DHS, have promulgated regulations governing requests for testimony or documents for use in litigation or investigations in which the agency is not a party. These regulations—commonly known as "*Touhy* regulations" after the Supreme Court decision, *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), that

-11-

recognized their general validity—were promulgated under authority derived from the Federal Housekeeping Act, 5 U.S.C. § 301.

36)     The Federal Housekeeping Act does not create independent authority to withhold information; it merely authorizes agencies to establish *procedures* governing how requests for testimony or records are handled internally.  *See* 5 U.S.C. § 301 ("This section does not authorize withholding information from the public or limiting the availability of records to the public."); MOORE'S FEDERAL PRACTICE § 45.05[1][b] (3d ed. 2006) ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a [legal demand], the legal basis for any opposition to the [legal demand] must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.").

37)     *Touhy* regulations typically require that requests for testimony or records be directed to designated agency officials and establish procedures for determining whether disclosure will be authorized.  The principal purpose of such regulations is to centralize agency decision-making regarding the disclosure of official information, ensure consistency in responses, and prevent unauthorized disclosures by individual employees.

38)     *Touhy* regulations typically set forth the factors that agency officials should consider in evaluating legal demands, including the applicability of relevant legal protections— such as privileges, confidentiality interests, or law enforcement sensitivities—and the need for appropriate disclosure notwithstanding these legal protections.  These factors cannot, however, create any new privileges or substantive bases for withholding information.

### a.  DOJ's *Touhy* Regulations

39)     DOJ's *Touhy* regulations expressly provide that voluntary disclosure of information to state and local law enforcement and prosecutorial agencies is permitted, without

the need for any formal demand and without the need for compliance with the *Touhy* regulations. *See* 28 C.F.R. § 16.21(c).

40)     Where voluntary disclosure to state and local law enforcement is not made, and where a formal *Touhy* request is issued, DOJ's *Touhy* regulations provide that the decisionmaker "will authorize disclosure" unless disclosure would violate the law or procedural rules, or adversely affect law enforcement activities or governmental interests. *See* 28 C.F.R. § 16.26(c).

41)     In matters involving criminal or civil investigations, the DOJ regulations specifically contemplate consideration of whether disclosure could reveal law enforcement techniques, procedures, or confidential sources, interfere with investigations, or otherwise compromise law enforcement interests. 28 C.F.R. § 16.26(b). But the DOJ's regulations do not authorize withholding merely because requested information contains sensitive law enforcement information. Instead, the regulations allow the DOJ to disclose such information when necessary for the "administration of justice." In making that determination, the responsible officials must evaluate factors such as the seriousness of the violation or crime and the significance of the relief sought and legal issues presented. 28 C.F.R. § 16.26(c).

### b. DHS's *Touhy* Regulations

42)     Like DOJ, DHS also permits agency officials to disclose information to state and local law enforcement authorities in conjunction with criminal law enforcement investigations and prosecutions, *without* needing to comply with the procedural requirements of the agency's *Touhy* regulations. *See* 6 C.F.R. § 5.41(i); *see also* 19 C.F.R. § 103.21(e) (CBP's *Touhy* regulations similarly state that they are not meant to impede the "appropriate disclosure" of information to state and local law enforcement authorities).

43)     Where voluntary disclosure to state and local law enforcement is not made, and where a formal *Touhy* request is issued, DHS's *Touhy* regulations direct officials to consider similar factors, including the public interest; whether disclosure would be consistent with DHS's mission and responsibilities; the need to avoid spending the time and money of the United States for private purposes; and whether the information is otherwise protected by privilege or confidentiality obligations.  *See* 6 C.F.R. § 5.48.

### c. *Touhy* Regulations Generally

44)     State and local governmental entities, including law enforcement agencies and regulatory authorities, frequently require testimony and records from federal agencies in connection with criminal investigations, enforcement actions, and judicial proceedings.   In practice, and in the absence of voluntary law-enforcement-to-law-enforcement disclosure, *Touhy* requests operate as the mechanism through which state and local authorities generally must request testimony or documents from federal agencies or federal employees for use in legal proceedings.   Federal agencies generally require that such requests be submitted through the procedures established by their *Touhy* regulations rather than through direct service of subpoenas on federal personnel or agencies.  *See In re Elko Cnty. Grand Jury*, 109 F.3d 554, 555-56 (9th Cir. 1997) (holding that a "state court lacked jurisdiction to issue [a grand jury] subpoena" to a federal agency); *see also Houston Bus. J., Inc. v. OCC*, 86 F.3d 1208, 1213 (D.C. Cir. 1996) ("When the documents are sought from a federal agency . . . , the proper procedure is to make an administrative request, from which review may be had under the APA.").

45)     A *Touhy* demand is distinct from a request for government records submitted under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and operates under a materially different disclosure framework.  Records released under FOIA are effectively disclosed to any

-14-

member of the public without restriction, and the requestor's need for the information cannot overcome the applicability of a qualified privilege (such as for law enforcement techniques and procedures). By contrast, *Touhy* requests arise in connection with specific litigation or investigations and the applicable regulations generally require agencies to evaluate privileges and confidentiality interests in light of the requestor's particularized need for the information, including by authorizing disclosure subject to protective orders or other confidentiality conditions.

46) As described below, Defendants denied or ignored Plaintiffs' *Touhy* requests seeking disclosure of records and testimony relevant to evaluating the three federal officer-involved shootings that occurred in Minnesota in January 2026.

## FACTUAL ALLEGATIONS

47) In late 2025, the Trump Administration initiated a large-scale immigration enforcement initiative known as Operation Metro Surge. The federal government deployed thousands of federal officers from agencies including ICE and CBP to conduct immigration enforcement activities in Minnesota. This operation represented an unprecedented concentration of federal immigration personnel and was undertaken without coordination with state and local authorities.

48) In a break from longstanding law enforcement practices, federal officers in Operation Metro Surge frequently concealed their identities with masks. Masking not only conceals agents' identities from the public, it also makes it difficult for state and local investigators to identify agents involved in shootings or other potentially unlawful incidents without federal cooperation. The fact that federal officers intentionally concealed their identities

underscores the need for Plaintiffs to access investigative material relating to the three shootings by federal agents during Operation Metro Surge.

### I. The Fatal Shooting of Renee Good

49) On the morning of January 7, 2026, ICE Agent Jonathan Ross shot and killed 37-year-old U.S. citizen Renee Good in her car on a public street in Minneapolis, Hennepin County, Minnesota. Video footage of the killing has been widely publicized by the media.

50) Ms. Good's friends and family describe her as a prize-winning poet and hobby guitarist who was extremely compassionate, loving, forgiving, and affectionate. Ms. Good lived in Minneapolis with her wife and three children.

51) As is standard practice in officer-involved shootings—including incidents involving federal officers—the BCA arrived at the scene and began investigating the incident alongside federal investigators. The BCA has extensive experience investigating officer-involved use of force cases and indeed has a team of investigators specially trained to conduct use of force investigations.[6]

52) On the morning of the shooting, the BCA and leadership in the FBI's Minneapolis Field Office agreed to conduct a joint investigation into the killing. They reached this decision after consulting with the Hennepin County Attorney's Office and the U.S. Attorney's Office for the District of Minnesota. The First Assistant U.S. Attorney confirmed to the Hennepin County Attorney's Office on the morning of January 7, 2026, that the FBI and the BCA would collaborate on a joint investigation.[7]

---

[6] *See* Minn. Dept. of Public Safety, BCA, *BCA force investigations*, https://dps.mn.gov/divisions/bca/bca-divisions/investigative-services/bca-force-investigations.
[7] The First Assistant U.S. Attorney resigned from the Minnesota U.S. Attorney's Office in mid-January 2026. *See, e.g.*, Matt Sepic, *Joe Thompason, Minnesota's Top Federal Fraud Prosecutor, Quits Over ICE Shooting Probe*, MPR NEWS (Jan. 13, 2026),

53) BCA investigators relied on these representations by federal officials in making decisions about the course of their investigation, including actions taken at the scene. For example, BCA investigators trusted that important evidence gathered by federal investigators would be made available to them for inspection and analysis. Such evidence includes the vehicle in which Ms. Good was shot, shell casings discharged at the scene, and the shooter's firearm. Had BCA investigators known that federal authorities would thereafter refuse them access to evidence collected at the scene, they would have taken different measures to secure the availability of that evidence. As another example, in the hours after the shooting death of Ms. Good, BCA agents went to the Whipple Federal Building to interview the federal officers involved in the incident. FBI agents told the BCA agents that they would be included in the interviews. Less than an hour later, however, BCA agents were told that the position of the federal government had changed and that HSI would not allow BCA agents to be present. BCA's requests for even the most basic information—such as the names of the involved federal officers—were ignored. And the point of contact given to the BCA agents—the Acting Director of the ICE St. Paul Field Office—did not respond to outreach attempts.

54) The FBI informed the BCA that—despite the initial agreement earlier that day to jointly work the case and share files—the federal government would immediately cease any and all cooperation with State authorities. BCA investigators were excluded from interviews, prevented from following standard investigative procedures, and blocked from accessing key physical evidence. When the BCA asked the FBI why they would no longer cooperate with State authorities, the FBI directed the BCA to the U.S. Attorney for the District of Minnesota.

---

https://www.mprnews.org/story/2026/01/13/us-attorney-on-minnesota-fraud-joe-thompson-resigns-from-office.

-17-

55)     On the evening of January 7, 2026, the U.S. Attorney for the District of Minnesota confirmed to the BCA Superintendent that there would be no joint investigation and no federal cooperation or evidence sharing with state officials.

56)     Public statements from high-ranking federal officials confirmed that there would be no federal cooperation with the BCA's investigation into Ms. Good's death.[8] DHS Secretary Kristi Noem incorrectly asserted that, "[t]hey [the State of Minnesota] don't have any jurisdiction in this investigation,"[9] and President Trump stated that there would be no federal cooperation because Minnesota officials were "crooked."[10] By the time of these statements, federal authorities had already taken exclusive possession of key pieces of evidence.

57)     Federal officials not only shut out the BCA from the investigation, but they also halted any *federal* investigation into Ms. Good's killing. DOJ Deputy Attorney General Todd Blanche stated during a news interview: "We investigate when it's appropriate to investigate. And that is not the case here. . . . So no, we are not investigating."[11]

---

[8] *See* Sydney Kashiwagi, *Justice Department Says It Has No Plans to Investigate ICE Agent Who Killed Renee Good and Confirms Walz, Frey probe*, MINN. STAR TRIB. (Jan. 18, 2026), https://www.startribune.com/justice-department-says-it-has-no-plans-to-investigate-ice-agent-who-killed-renee-good-and-confirms-walz-frey-probe/601566499 [https://www.hennepinattorney.org/-/media/cao/news/2026/20260316_strib-jd-no-plans.pdf?rev=991f38213ca249648f4bf789526f631d&hash=C1048EC9A62AF1AEC574F3332D573FD7].

[9] Caroline Cummings, *Minnesota AG, Hennepin Co. Vow to Still Collect Evidence in ICE Shooting After State Authorities Shut Out of Federal Investigation*, CBS MINN., Jan. 9, 2026, https://www.cbsnews.com/minnesota/news/minnesota-ice-shooting-hennepin-county-collects-evidence-investigation/.

[10] Willa Pope Robbins, *Trump Says He's Freezing Minnesota Officials Out of ICE Shooting Probe Because Tim Walz Is 'A Stupid Person*,' MEDIAITE - YAHOO NEWS (Jan. 9, 2026), https://www.yahoo.com/news/articles/trump-says-freezing-minnesota-officials-230604582.html.

[11] FOX NEW SUNDAY, *Deputy AG Calls Out Dems "Complete Lie" about ICE Agents amid Minneapolis Protests* (Jan. 18, 2026) https://www.foxnews.com/video/6387906201112 (at 6:53-8:28).

58) According to public reporting, multiple prosecutors and agents within the Justice Department resigned due at least in part to the federal government's failure to follow typical practice by refusing to criminally investigate the federal agent who killed Ms. Good.[12] The officials who resigned included an FBI agent who was pressured to discontinue a civil rights inquiry into the federal agent who shot Ms. Good in favor of an investigation of Ms. Good's wife.[13]

59) The federal government's decision not to investigate the killing of Ms. Good ignores evidence suggesting that the shooting may have violated federal law; the decision is thus inconsistent with a longstanding federal practice to conduct criminal investigations under such circumstances, even if it is the prerogative of the federal government to make that decision. Nevertheless, the State of Minnesota has an independent sovereign prerogative and responsibility to investigate the shooting for possible violations of Minnesota's own criminal laws.

60) Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the killing of Ms. Good on a Minneapolis public street. The BCA and the HCAO are leading this investigation, and the HCAO will be responsible for determining whether to bring any charges after considering the available evidence. The HCAO has not yet determined whether a violation of state law has occurred.

---

[12] Ernesto Londoño, *Six Prosecutors Quit Over Push to Investigate ICE Shooting Victim's Widow*, N.Y. Times (Jan 13. 2026), https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html.

[13] *See* Alan Feuer & Glenn Thrush, *FBI Agent Resigns After Trying to Investigate ICE Officer in Renee Good Shooting*, N.Y. TIMES (Jan. 23, 2026), https://www.nytimes.com/2026/01/23/us/politics/fbi-agent-ice-shooting-renee-good.html [https://docs.house.gov/meetings/JU/JU00/20260211/118951/HHRG-119-JU00-20260211-SD007.pdf].

61) In connection with that investigation, Minnesota courts have already found probable cause to issue search warrants for evidence related to the death of Ms. Good. For example, the BCA obtained a search warrant for Ms. Good's car. On information and belief, Ms. Good's car is located in an FBI storage facility in Brooklyn Center, Minnesota. To the BCA's knowledge, the car is shrink-wrapped and has never been examined or processed. The BCA has repeatedly asked the FBI to provide them with Ms. Good's car or to allow the BCA to execute their search warrant on the car. FBI officials have either refused or not responded to these requests.

62) Most recently, on March 18, 2026, the FBI informed the BCA that DOJ and DHS had decided that evidence related to Ms. Good's killing would not be released or made available to the BCA. According to the FBI, DOJ and DHS had directed the FBI to turn over the evidence related to Ms. Good's killing to DHS's Office of Inspector General only—not the BCA.

## II. The Shooting of Mr. Sosa-Celis

63) On the evening of January 14, 2026, a federal immigration agent shot and wounded Julio Cesar Sosa-Celis in Minneapolis, Hennepin County, Minnesota. At the time he was shot, Mr. Sosa-Celis, a Venezuelan national, lived in Minneapolis with his wife and three-year-old child.

64) Initially, federal agents again led state investigators to believe that they would cooperate with one another's investigations, as they had in historical practice. Local investigators relied on those representations to make decisions about their investigation, including actions they took at the scene. For instance, in the immediate hours after the shooting, BCA and FBI agents initially paired into teams to begin witness interviews and to complete a canvas of the area. BCA

and FBI agents conducted several joint interviews, but the BCA relied on FBI agents to collect key pieces of evidence.

65)     This initial collaboration abruptly ended, however, when the FBI Assistant Special Agent in Charge gave directions that BCA agents would not be allowed to collaborate with the FBI in the investigation.  As a result, BCA investigators were excluded from witness and subject interviews and no longer had access to the evidence that FBI agents collected.

66)     After the short-lived joint investigation was ended by the FBI, but before investigators left the scene of the shooting, BCA agents secured a judicial search warrant to obtain evidence at the scene of the shooting.  In executing that warrant, the BCA was able to obtain several pieces of evidence, but they were unable to obtain the handgun used in the shooting or any other evidence from the federal agents involved.

67)     The number of civilians at the scene began to grow, and people in the crowd began to protest the federal activity that had occurred.  Local police and federal agents were attempting to hold a perimeter around the scene, but as the size of the crowd grew it became more and more difficult to hold the scene.  Federal officers began to leave the area, and the decision was made by BCA investigators to collect as much evidence as possible via the search warrant, and then leave the area.  BCA agents returned to the scene in subsequent days and obtained additional evidence that they were not able to obtain on the night of the incident.  But, important evidence remains in the exclusive control of federal officials – including but not limited to names and statements from involved federal officials, the gun used in the incident, and the federal vehicle used in the incident.

68)     Within days of the incident, federal officials charged Mr. Sosa-Celis with attacking the federal agent who shot him.  The Justice Department moved to voluntarily dismiss

that case with prejudice on February 12, 2026, citing "newly discovered evidence" in the case that was "materially inconsistent with the allegations in the Complaint Affidavit." *See United States v. Aljorna*, No. 26-mj-23, ECF No. 48 (D. Minn. Feb. 12, 2026). News media reported it had become "clear that the federal agents involved lied during sworn testimony."[14]

69)     Plaintiffs have repeatedly asked federal officials to allow them access to investigative information about the Sosa-Celis matter. Despite these efforts, federal officials have refused to provide access to investigative information.

## III.     *The Fatal Shooting of Alex Pretti*

70)     On the morning of January 24, 2026, federal immigration agents shot and killed U.S. citizen Alex Jeffrey Pretti on a public street in Minneapolis, Hennepin County, Minnesota. Based on available video footage of the incident, it appears that Mr. Pretti was restrained by multiple officers when two masked officers shot and killed him. Video of the killing has been widely publicized by the media. Mr. Pretti lived in Minneapolis and worked as an intensive care unit nurse in the Minneapolis Veterans Administration Health Care system.

71)     The federal government physically blocked the BCA from processing or even accessing the scene of the shooting, denying them access to important physical evidence.

72)     Shortly after the shooting, BCA investigators arrived at the scene to conduct a state investigation into the incident. The BCA was informed by a federal agent serving as the incident commander that he had been ordered not to allow the BCA onto the scene. Instead, the

---

[14] Liz Sawyer, *Federal Agents Lied About Why They Shot a Venezuelan Man in Minneapolis. Their Story Quickly Fell Apart*, Minn. Star Tribune (Mar. 8, 2026), https://www.startribune.com/federal-agents-lied-about-why-they-shot-a-venezuelan-man-in-minneapolis-their-story-quickly-fell-apart/601567060 [https://www.hennepinattorney.org/-/media/cao/news/2026/20260316_strib-fed-agent-lied.pdf?rev=cbe67bf6cd3d4165af6a633d4365e07e&hash=B668ED8D00E86F8BE79A08A28E736592].

federal agent said he had been ordered to permit only the FBI to process the scene. When the BCA asked if its Crime Scene Team could assist with scene processing, the FBI refused.

73) Federal agents also excluded the BCA from participating in witness interviews. That same day, January 24, BCA agents went to the Whipple Federal Building to interview the federal agents involved the shooting. After waiting for hours, they were eventually told by the HSI Assistant Special Agent in Charge ("ASAC"), that HSI was leading the use of deadly force investigation and the FBI would be assisting. The ASAC then informed the BCA that they would not be allowed to participate in any part of the investigation. To date, the federal government has not provided the identities of the masked federal agents who shot Mr. Pretti to the BCA or HCAO.

74) As a result, important evidence was taken into the exclusive possession and control of federal investigators before the BCA had any opportunity to examine, photograph, or document it. This evidence includes, but is not limited to, Mr. Pretti's cellphone, which likely captures his interactions with federal agents in the moments before his death, and the firearm that federal agents removed from Mr. Pretti before the fatal shooting.

75) Despite the federal government's refusals to cooperate in the investigations of the shootings of Ms. Good and Mr. Sosa-Celis, the BCA continued to press for a return to the well-established norm of cooperation in regard to the shooting of Mr. Pretti. On or about February 5, 2026, the U.S. Attorney's Office for the District of Minnesota and the FBI reached out to the BCA to indicate a desire to resume normal cooperation, including evidence-sharing and the potential for a joint investigation into Mr. Pretti's killing.

76) Senior DOJ officials dispatched an attorney from DOJ's Washington, DC, headquarters to Minneapolis to coordinate the federal response to the State's request for evidence, who arrived on or about February 9, 2026.

77)     In a meeting between the BCA, FBI, and the U.S. Attorney, on February 13, 2026, the U.S. Attorney conveyed that evidence would be shared in only one direction: DOJ expected the BCA to share its evidence with federal authorities, but federal authorities had no intention of sharing their evidence with the State.  That same day the FBI formally notified the BCA that it would not provide the BCA with access to any information or evidence related to the death of Mr. Pretti.  Based on the sequence of events and the involvement of senior federal officials such as the U.S. Attorney, it is apparent that this decision was made at the highest levels of DOJ.

### IV.     *Federal Policy and Practice of Declining to Share Investigative Evidence in Operation Metro Surge Use-of-Force Investigations*

78)     In the span of less than three weeks in Minneapolis, federal officers were involved in three separate shootings, two of which were fatal.  After some early indications that federal and state authorities would jointly investigate the shootings, consistent with longstanding practice, federal cooperation and information sharing abruptly ceased at the direction of high-ranking officials at DOJ and DHS.

79)     State authorities repeatedly sought clarification and requested that federal authorities resume the ordinary practice of evidence sharing that typically occurs in investigations involving overlapping federal and state jurisdiction.  Federal officials did not identify any case-specific investigative reason why such evidence sharing could not continue.

80)     This sequence of events—including the cessation of cooperation across multiple investigations, the involvement of senior Department of Justice officials, and the ultimate categorical refusal to provide investigative materials—reflects more than isolated discretionary decisions not to share evidence in individual cases.  Rather, these events reflect the adoption and implementation of a policy or practice under which DOJ and DHS will decline to share investigative information with state authorities concerning shootings involving federal

immigration officers deployed during Operation Metro Surge.  This policy or practice reflects Defendants' settled position that investigative materials relating to these incidents will not be shared with Minnesota authorities.  That position was communicated to state officials by federal officials with authority to determine whether such information would be disclosed and was applied to Plaintiffs' requests for investigative materials relating to all three shootings.

## V.   Plaintiffs' Formal Touhy Demands to DOJ and DHS

81)   After being unable to obtain investigative materials through ordinary channels, Plaintiffs submitted formal Touhy requests to DOJ and DHS seeking disclosure of investigative information and materials relating to all three Operation Metro Surge shootings.  This was done, notwithstanding Defendants' demonstrated unwillingness to cooperate with Plaintiffs, to ensure that all avenues of redress were pursued.  Defendants' responses to those Touhy requests—and, in certain instances, their failure to respond—reflect the application of the policy or practice described above.

82)   On February 2, 2026, the Hennepin County Attorney's Office submitted substantively identical, formal Touhy demands to DHS and DOJ for evidence relevant to the HCAO's investigation of the fatal shooting of Ms. Good.  Based on the urgency of the HCAO's need for the requested documents and testimony, as explained further below, and the fact that it appeared that federal authorities had already decided not to share evidence with State authorities, the HCAO requested initial responses from DHS and DOJ by February 17, 2026.  True and correct copies of those demand letters are attached as Exhibit 1 and 2.

83)   On February 17, 2026, the HCAO and BCA jointly submitted substantively identical, formal Touhy demands to DHS and DOJ for evidence relevant to their investigation of the killing of Mr. Pretti.  This demand followed on the heels of the February 13, 2026, final

decision, as announced by the FBI, that federal authorities would not be sharing evidence with the State on the Pretti matter. Although Plaintiffs understood that the February 13 decision to deny evidence sharing constituted the final determination of the agency on the matter, the HCAO and BCA nonetheless submitted a *Touhy* demand in an abundance of caution and to ensure that all avenues for obtaining the much-needed evidence were explored. The HCAO requested initial responses from DHS and DOJ by March 3, 2026. True and correct copies of those demand letters are attached as Exhibit 3 and 4.

84) On February 18, 2026, the HCAO submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to its investigation of the shooting of Mr. Sosa-Celis. Based on the urgency of the HCAO's need for the testimony and records, the HCAO requested initial responses from DHS and DOJ by March 5, 2026. True and correct copies of those demand letters are attached as Exhibit 5 and 6.

85) In each of the demand letters, the HCAO and/or BCA explained why they need the evidence to complete a comprehensive investigation of each incident. For example, physical evidence, including the firearms used in the shootings, will assist Plaintiffs in reconstructing the incidents. Audiovisual evidence (including footage that contains contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist Plaintiffs in establishing the sequence of events and shed light on the officers' states of mind. And operational plans, along with employment and training records, are relevant to discerning the officers' preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed their states of mind at the times of the incidents and may bear on the objective reasonableness of the use of force. Each demand

-26-

letter complied with the relevant agency's *Touhy* regulations and also explained why the relevant factors clearly weighed in favor of disclosure.

86)  Each of the demand letters further explained that the need for evidence was extraordinarily time-sensitive.  The evidence is needed for ongoing investigations, and delay may materially affect the direction, scope, and timing of the investigations.  The letters also noted that it is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days.  This is in part because the passage of time can result in dissipation and deterioration of evidence.  Most obviously, witness memories fade.  Plaintiffs' prompt access to federal law enforcement witnesses is essential to ensure that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

87)  Plaintiffs' prompt access to documentary and physical evidence is equally important for the same reason.  State investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed witness interviews.  Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost.

88)  The physical evidence sought is also subject to the risk of deterioration, amplifying Plaintiffs' need for swift access.  For example, if not stored properly, biological evidence and other forensic evidence could deteriorate beyond testing capabilities.  This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in these shooting incidents.  For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal

processing. BCA investigators would have typically completed 3D scans of the incident scenes, conducted detailed analyses of bullet trajectories, and obtained precise measurements related to key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators quickly processed the scene and then removed key physical evidence before local investigators could conduct their work.

89) Plaintiffs are further concerned about the possibility of evidence spoliation, amplifying their urgent need for access. Only hours after the shooting of Alex Pretti, President Trump posted a photograph of a firearm on the social media website, Truth Social, that the President claimed was Mr. Pretti's firearm.[15] The photograph shows the gun on the seat of a car, surrounded by charging cords, which indicates it was not protected or handled according to normal law enforcement processes meant to properly preserve evidence.

90) Plaintiffs also explained in each *Touhy* demand letter that prompt disclosure of the requested evidence is important to ensure compliance with United States and Minnesota law. Such law includes the right of the accused to due process and the Minnesota statute of limitations. *See generally State v. Banks*, 875 N.W.2d 338, 341 (Minn. Ct. App. 2016), review denied (Minn. Sept. 28, 2016); *see also* Minn. R. Crim. P. 30.02, Minn. Stat. Ann. §§ 628.26. Minnesota law also provides crime victims with the rights of notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

91) Each of the three demand letters to DHS was sent by certified mail to the Office of General Counsel of DHS in Washington, D.C., with copies to sub-agencies of DHS and the

---

[15] Donald J. Trump (@realDonald Trump), TRUTH SOCIAL (Jan. 24, 2026, 1:06 P.M.), https://truthsocial.com/@realDonaldTrump/posts/115951636521315703 [https://www.hennepinattorney.org/-/media/cao/news/2026/20260320_truth.pdf?rev=666c3841c9c747d5a27bcd477c80da73&hash=4 B8D5209D46907373E33FFFCB282FF1B].

Minnesota U.S. Attorney's Office.  Each letter was also sent by email to the Office of the General Counsel and, as a courtesy, to officials within DOJ's Civil Division responsible for coordinating the federal government's response to *Touhy* demands.

92)　　Each of the three demand letters to DOJ was sent by certified mail to the U.S. Attorney for the District of Minnesota, with a copy to the Department of Justice in Washington, D.C.  Each letter was also sent by email to the U.S. Attorney for the District of Minnesota and the head of that offices Civil Division and, as a courtesy, to officials within DOJ's Civil Division responsible for coordinating the federal government's response to *Touhy* demands.

## VI.　　*Defendants' Response to Plaintiffs'* Touhy *Requests*

### a.　*DHS's Response*

93)　　On February 18, 2026—one day after the date by which it had requested a response from DHS in the Good matter—the HCAO received an email from a senior attorney at ICE, the body of which read:

> ICE is considering the attached DHS Touhy demand for records regarding the death of Ms. Renee Nicole Good and is formulating its response.  We have also recently received the attached DHS Touhy demand for records regarding the death of Mr. Alex Pretti, which has a requested deadline for DOJ [sic] to respond by March 3, 2026.  We kindly request an extension to March 3, 2026 as to the demand regarding Ms. Good.  We will respond sooner if possible.  Thank you in advance for your anticipated courtesy.

The HCAO agreed to the requested extension in light of the agency's commitment to respond no later than March 3, 2026.  In the same email, the HCAO reiterated its need for expedient disclosure of the evidence.  A true and correct copy of this exchange is attached as Exhibit 7.

94)　　On March 3, 2026, the HCAO received a final written response from DHS in the Good matter.  Citing 6 C.F.R. § 5.41, the response claimed that DHS's *Touhy* regulations "do not apply to disclosure of official information to federal, state or local law enforcement authorities

related to criminal law enforcement investigations." In light of this legal position, DHS indicated that it was considering the HCAO's demand as a request under the Privacy Act, 5 U.S.C. § 552a. The response went on to state that DHS was "refer[ring]" the HCAO "to DOJ" for a response, because "the U.S. Department of Justice (DOJ), Federal Bureau of Investigation (FBI) is leading the investigation into the subject matter of your demand." A true and correct copy of DHS's letter is attached as Exhibit 8.

95) DHS's response to the *Touhy* demand in the Good matter constitutes final agency action, because (1) it articulates the final decision of the agency that its *Touhy* regulations do not apply to requests from state and local law enforcement related to criminal investigations, (2) it decides that it will neither comply with, nor even process, the request, instead "refer[ring]" the HCAO to a separate cabinet-level agency, and (3) it has binding legal consequences for the HCAO in that, absent judicial intervention, HCAO will be unable to access the evidence it seeks to investigate this incident.

96) Both of the bases provided for DHS's denial of the HCAO's request are legally meritless and provide no lawful justification for refusing to process the demands and provide the requested evidence.

97) The provision of DHS's *Touhy* regulations cited in DHS's response, 6 C.F.R. § 5.41, provides:

> Nothing in this subpart affects the disclosure of official information to other federal agencies or Department of Justice attorneys in connection with litigation conducted on behalf or in defense of the United States, its agencies, officers, and employees, or litigation in which the United States has an interest; or to federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings, e.g., extradition, deportation.

That provision preserves the ability of agency employees to make voluntary disclosures to law enforcement without going through formal *Touhy* procedures. It does not prevent DHS from considering demands from state law enforcement under its *Touhy* regulations.

98) DHS's construction of this provision is also contrary to the language of other portions of 6 C.F.R. § 5.41. For example, Section 5.41(d) describes the regulations as encompassing "all judicial or administrative actions, hearings, *investigations*, or similar proceedings before courts, commissions, boards . . ., grand juries, or other judicial or quasi-judicial bodies or tribunals, whether *criminal*, civil, or administrative in nature." (emphasis added). DHS's interpretation of its regulations nullifies the regulatory framework governing *Touhy* requests in circumstances where state law enforcement authorities seek evidence in connection with criminal investigations, a result unsupported by the regulations and inconsistent with their purpose.

99) DHS's decision to "refer" the request to DOJ, rather than processing and complying with it, is likewise legally unsupportable. The HCAO's demand to DHS sought evidence in DHS's possession, custody, and control, including agency personnel files, operational plans in place at the time of the incidents, identities of federal officers at the scene, and access to those witnesses for interview. Notably, DHS did not represent that it does not have any of the requested evidence. And there is every reason to expect it does. Even if DHS has turned over copies of certain evidence to the FBI as part of an ostensible federal investigation (that DOJ has denied conducting), DHS still has possession and control of that evidence in its own files and therefore has an obligation to process the HCAO's demand.

100) DHS's improper "deferral" to DOJ of responsibility for processing and complying with the request for DHS records and testimony in the Good matter reflects a broader policy by

-31-

DHS not to provide evidence to state authorities and instead to cede all decision making—and all accountability for withholding evidence—to DOJ.  This policy was on view during testimony by Kristi Noem, Secretary of Homeland Security, before the Senate Judiciary Committee on March 3, 2026.  In response to a Senator's question about DHS's recent practice of "not allowing state and local investigators to participate" in investigations of incidents of violence involving federal immigration officers, Secretary Noem stated, "That is not my decision," and then noted that it was a decision for DOJ and the FBI.[16]

101)    Despite acknowledging the March 3, 2026, deadline set forth in Plaintiffs' *Touhy* demand in the Pretti matter—and seeking an extension of the deadline in the Good matter to match that deadline—DHS has not responded to the Pretti demand.  Nor has it responded to the *Touhy* demand in the Sosa-Celis matter, despite the March 5, 2026, deadline also having passed.

102)    DHS's response in the Good matter, as set forth above, articulated the Department's legal position that (1) its *Touhy* regulations do not apply to requests for information submitted in connection with state criminal investigations and (2) that DHS will not accept responsibility for deciding whether to share information with state investigators, despite its obligation to do so.  Because this reasoning applies equally to Plaintiffs' other pending requests, DHS's response effectively resolved those requests as well.  All three requests have been effectively denied.

### b.  *DOJ's Lack of Response*

103)    To date, DOJ has not provided any response to the three *Touhy* demand letters submitted, nor have they sought an extension of the deadlines set forth in those demands

---

[16] PBS News Hour, WATCH: Sen. Schiff Questions DHS Secretary Noem in Oversight Hearing (Mar. 3, 2026), available at https://www.youtube.com/watch?v=btUQNmWCItQ (at 3:30-3:55).

(February 17, March 3, and March 5). As noted above, however, DOJ has repeatedly formally refused to share any evidence in these cases. This occurred on the day of the Good shooting, January 7, 2026, when the U.S. Attorney for the District of Minnesota informed the BCA it would not share information or provide access to evidence. This position was reiterated by federal officials on March 18, 2026, when the BCA was again informed there would be no evidence sharing. This occurred in the Sosa-Celis matter on the day of the shooting, January 14, 2026, when FBI officials informed BCA agents that there would be no further evidence sharing. And it occurred again when the BCA's request for evidence in the Pretti matter was denied on February 13, 2026. Those repeated denials represent the Department's definitive decision not to share any evidence with Plaintiffs in these matters.

104) DOJ's refusal to share evidence in these matters did not reflect any case-specific determination of the competing interests in disclosure or withholding of evidence. Instead, it reflected a policy or practice by DOJ, made by officials with authority to do so, that the Department would categorically withhold evidence from state authorities related to federal uses of force during Operation Metro Surge. This is confirmed by the unprecedented course of events that took place during January 2026, including the abrupt departure from long-standing intergovernmental cooperation across all three investigations related to Operation Metro Surge shootings; the statements of the U.S. Attorney for Minnesota; and the involvement of a representative dispatched from senior DOJ leadership leading to the reversal of the earlier offer by federal authorities to cooperate in the Pretti matter.

105) This policy or practice reflects the Justice Department's settled position that investigative materials relating to these incidents will not be shared with Minnesota authorities,

and it is directly responsible for DOJ's refusal to comply with all three *Touhy* demands submitted to it.

106)    DOJ has not identified any lawful basis that would justify their refusal to share evidence with Plaintiffs related to the shootings of Ms. Good, Mr. Pretti, or Mr. Sosa-Celis.  Nor did DOJ provide a lawful justification for its dramatic departure from prior long-standing practice of state-federal cooperation and evidence sharing, on which the State detrimentally relied. Principles of federalism do not permit the federal government to withhold investigative evidence for the purpose of shielding law enforcement officers from scrutiny where a State is investigating serious potential violations of its criminal laws, targeting its citizens, within its borders.

## CAUSES OF ACTION

### COUNT I
### Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious, Not in Accordance with Law, in Excess of Statutory Authority
### (U.S. Department of Homeland Security – Good, Pretti, & Sosa-Celis Matters)

107)    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

108)    The Administrative Procedure Act ("APA") provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

109)    DHS's March 3, 2026, response to the *Touhy* request in the Good matter constitutes final agency action within the meaning of the APA with respect to all three *Touhy* demands to DHS because it represents the agency's definitive position that the *Touhy* regulations do not apply to demands for evidence for use in criminal investigations and because that final

decision has appreciable legal consequences for Plaintiffs. Due to the categorical nature of DHS's position on its responsibilities under its *Touhy* regulations, which applies equally to the demands in the Pretti and Sosa-Celis matters, the March 3, 2026, response definitively resolved that DHS will not process any of Plaintiffs' demands or make any of the requested evidence available to Plaintiffs.

110) DHS's decision to refuse to process the *Touhy* request in the Good matter on the grounds that (1) the agency's Touhy regulations "do not apply to disclosure of official information to federal, state, or local law enforcement investigations," and (2) that the matter could and should be "refer[red]" to DOJ, is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

111) DHS has not identified any lawful basis for withholding the material sought by Plaintiffs in the demands related to the Good, Sosa-Celis, and Pretti matters. DHS has not asserted that disclosure of the materials sought would reveal privileged information, compromise investigative techniques, interfere with an ongoing investigation, divert agency resources for private purposes, or otherwise implicate any factor that could justify withholding under DHS's regulations.

112) DHS's actions also exceed the authority conferred by the Federal Housekeeping Act, which permits agencies to establish procedures governing the disclosure of records but does not authorize agencies to withhold information or decline to evaluate disclosure requests absent a lawful basis.

113) DHS lacks a lawful basis to refuse to process and comply with the *Touhy* demands and to refuse to disclose the requested materials for use in connection with Plaintiffs' criminal investigations of the Good, Pretti, and Sosa-Celis shootings.

**COUNT II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)**
**Arbitrary and Capricious, Not in Accordance with Law, in Excess of Statutory Authority**
**(U.S. Department of Justice – Good, Pretti & Sosa-Celis Matters)**

114)    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

115)    The Justice Department's refusal to provide evidence to Plaintiffs in the Good, Pretti, and Sosa-Celis matters is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

116)    As set forth above, DOJ adopted an authoritative and categorical policy or practice to refuse to share investigative information with Minnesota authorities concerning shootings involving federal immigration officers deployed during Operation Metro Surge.  This policy or practice is evidenced by, among other things, DOJ's final, definitive refusal to share evidence for use in each of the three investigations—a departure from prior norms of intergovernmental cooperation— without providing a case-specific justification in any of the three matters.  These refusals, though communicated to Plaintiffs at different times and in different manners, were each ultimately made by federal officials with authority over disclosure decisions, including under DOJ's *Touhy* regulations.

117)    Following the adoption of this policy or practice and the resulting refusal to provide information to BCA in the course of these three investigations, DOJ has refused to provide any response to Plaintiffs' formal *Touhy* demands.

118)    DOJ has not sought an extension of the February 17, March 3, 2026, or March 5, 2026, deadlines specified in the respective demands, or otherwise indicated an intent to reexamine its prior, definitive decision not to share evidence in these three investigations.  This

refusal to respond to or comply with the *Touhy* requests stems from and reflects the above-referenced policy or procedure.

119)    DOJ's decision to categorically refuse to share evidence with Plaintiffs in the Good, Pretti, and Sosa-Celis matters constituted final agency action from which review may be had under the APA.

120)    That decision was arbitrary and capricious.  DOJ has not identified any lawful basis that would excuse the Department from processing Plaintiffs' *Touhy* request or permit it to withhold evidence related to the  shootings of Ms. Good, Mr. Pretti, or Mr. Sosa-Celis, including information as basic as the identities of the federal officers present at the scene.

121)    DOJ's actions also exceed the authority conferred by the Federal Housekeeping Act, which permits agencies to establish procedures governing the disclosure of records but does not authorize agencies to withhold information or decline to evaluate disclosure requests absent a lawful basis.

122)    DOJ lacks any lawful basis to refuse to process and comply with the *Touhy* demand and to refuse to disclose the requested information for use in connection with Plaintiffs' criminal investigation of the Good, Pretti, and Sosa-Celis shootings.

**COUNT III**
**5 U.S.C. § 706(1)**
**Unlawfully Withheld and Unreasonably Delayed Agency Action**
***Pled in the Alternative***
**(U.S. Department of Justice – Good, Pretti & Sosa-Celis Matters)**

123)    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

124)    To the extent the Court concludes that the Justice Department's policy or practice of categorically refusing to provide evidence to the State in use of force investigations arising out

of Operation Metro Surge, and the resulting refusal to provide evidence in each of the three state investigations, does not constitute final agency action on which Plaintiffs are entitled to immediate judicial review, Plaintiffs seek relief under the APA for agency action unlawfully withheld or unreasonably delayed.

125) The APA provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

126) DOJ has not responded to Plaintiff's *Touhy* requests seeking investigative materials and testimony relating to the officer-involved shootings of Ms. Good, Mr. Pretti, and Mr. Sosa-Celis, despite the passage of the deadlines identified in those requests (February 17, March 3, and March 5). DOJ's regulations require responsible officials to evaluate such *Touhy* demands and determine whether disclosure will be authorized in light of the factors set forth in those regulations. By failing to issue any determination regarding them, DOJ has unlawfully withheld agency action that the regulations require the Department to take.

127) In the alternative, DOJ's failure to act on Plaintiffs' *Touhy* demands constitutes an unreasonable delay in agency action. Plaintiffs' requests seek information necessary for the State of Minnesota to complete ongoing criminal investigations, and they set forth in detail the urgency with which the evidence is needed to promptly determine whether violations of Minnesota law occurred. It is patently unreasonable for DOJ to ignore such a request.

128) Plaintiffs requested that the Department provide at least an initial response to both requests within fourteen days of the date of both demands. Given the urgent need for the requested information in connection with ongoing state criminal investigations, that timeframe was reasonable for purposes of acknowledging the requests and indicating whether the Department would authorize disclosure, even if additional time might ultimately be required to

-38-

coordinate the logistics of producing records or arranging testimony. Comparable federal criminal procedures routinely operate on similar or shorter timelines. Federal courts, for example, frequently require compliance with federal grand jury subpoenas within fourteen days, even where those subpoenas seek substantial records from third parties.

129) Likewise, FOIA—which governs requests for government records from members of the general public for any purpose—requires federal agencies to make an initial determination regarding disclosure within twenty working days. The requests at issue here, in contrast to FOIA requests, were submitted by state law enforcement authorities to allow them to carry out core sovereign responsibilities, and they were targeted to a discrete and readily identifiable body of evidence. Even measured against the longer FOIA standard, the response period has long since elapsed for all three requests, and the Department has neither provided a written determination nor sought additional time to do so.

130) DOJ's failure to process or decide Plaintiffs' requests therefore constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

**COUNT IV**
**TENTH AMENDMENT**
**(U.S. Department of Justice and U.S. Department of Homeland Security – Good, Pretti, and Sosa-Celis Matters)**

131) Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

132) Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

133)    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See Printz v. United States*, 521 U.S. 898, 935 (1997).

134)    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the States and their municipalities. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

135)    State and local control of law enforcement is essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012) (quoting The Federalist No. 45, at 293 (J. Madison)).

136)    Defendants' policy and practice of blocking state and local investigators from accessing evidence that is critical to ongoing criminal investigations into potential violations of Minnesota law violates Plaintiffs' core sovereign interests in investigating and enforcing Minnesota criminal law.

137)    Plaintiffs are entitled to a declaration that the Defendants' policy and practice violates the Tenth Amendment, and an injunction prohibiting Defendants from blocking access to evidence that is critical to their investigations into potential violations of Minnesota criminal law.

**PRAYER FOR RELIEF**

WHEREFORE, good cause having been shown, Plaintiffs respectfully pray that the Court:

1.  Declare that Defendants' policy or practice of refusing to share investigative materials with Minnesota authorities concerning the federal officer–involved shootings arising out of Operation Metro Surge is arbitrary, capricious, not in accordance with law, and in excess of statutory authority within the meaning of the APA;

2.  Set aside and vacate that unlawful policy or practice;

3.  Declare that the decision of the U.S. Department of Homeland Security refusing to process or grant Plaintiffs' *Touhy* request in the Good matter—and, by necessary extension, in the Pretti and Sosa-Celis matters—is arbitrary, capricious, not in accordance with law, and in excess of statutory authority;

4.  Set aside and vacate DHS's denial of Plaintiffs' *Touhy* requests;

5.  Order the Defendants to comply with Plaintiffs' *Touhy* requests by providing Plaintiffs with access to the requested evidence in the Good, Pretti, and Sosa-Celis matters.

6.  Declare that the Justice Department acted unlawfully in failing to process Plaintiffs' *Touhy* requests in accordance with its governing regulations and in refusing to provide the investigative materials requested by Plaintiffs in the Good, Pretti, and Sosa-Celis matters;

7. Order Defendants to comply with Plaintiffs' *Touhy* requests, including by providing Plaintiffs access to the testimony, records, and other evidence requested in connection with the investigations of the Good, Pretti, and Sosa-Celis shootings;

8. In the alternative, remand Plaintiffs' *Touhy* requests to Defendants with instructions to evaluate those requests promptly and in good faith under the applicable *Touhy* regulations and consistent with this Court's order;

9. Compel the Department of Justice, in the alternative, to act on Plaintiffs' outstanding *Touhy* requests without further delay;

10. Declare that Defendants' actions violate the Tenth Amendment of the U.S. Constitution;

11. Order Defendants to provide Plaintiffs access to evidence and investigative materials in the Good, Pretti, and Sosa-Celis shootings to remedy Defendants' Tenth Amendment violations;

12. Award costs and reasonable attorneys' fees incurred in this action to the extent permitted by law; and

13. Grant such other relief as the Court may deem just and proper.

Dated: March 24, 2026

KEITH ELLISON
Attorney General
State of Minnesota

/s/ Peter J. Farrell
PETER J. FARRELL
Deputy Solicitor General
JOSEPH RICHIE
Special Counsel
KIMBERLY SVENDSEN

Respectfully Submitted,

MARY F. MORIARTY
Hennepin County Attorney

/s/ Morgan D. Kunz
SARAH E. DAVIS
MORGAN D. KUNZ
CLARE A. DIEGEL
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487

Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
Peter.Farrell@ag.state.mn.us
Joseph.Richie@ag.state.mn.us
kimberly.svendsen@ag.state.mn.us

*Attorneys for Plaintiffs State of Minnesota and the Minnesota Bureau of Criminal Apprehension*

(612) 348-5550
Sarah.Davis@hennepin.us
Morgan.Kunz@hennepin.us
Clare.Diegel@hennepin.us

*/s/ Kyle R. Freeny*
KYLE R. FREENY (D.C. Bar No. 1684764)
NATHANIEL A.G. ZELINSKY (D.C. Bar No. 1724093)
WASHINGTON LITIGATION GROUP
(202) 521-8750
1717 K Street NW
Washington, DC 20006
kfreeny@washingtonlitigationgroup.org

/s/ Kate Talmor
MARY MCCORD (D.C. Bar No. 427563)
RUPA BHATTACHARYYA (D.C. Bar No. 1631262)
KATE TALMOR (D.C. Bar No. 90036191)
JULIA GEGENHEIMER (D.C. Bar No. 90034692)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
Georgetown University Law Center 600
New Jersey Ave. NW
Washington, D.C. 20001

*Attorneys for Plaintiff Mary Moriarty, in her official capacity as Hennepin County Attorney*