**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

REBECCA GOOD,

*Petitioner*,

v.

U.S. DEPARTMENT OF JUSTICE; U.S. DEPARTMENT OF HOMELAND SECURITY; FEDERAL BUREAU OF INVESTIGATION; TODD BLANCHE, in his official capacity as Attorney General of the United States; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; and KASH PATEL, in his official capacity as Director of the Federal Bureau of Investigation,

*Respondents.*

Case No. 0:26-mc-00025-ECT-DTS

Hon. Eric C. Tostrud

**PLAINTIFF REBECCA GOOD'S AMENDED MOTION FOR RETURN OF PROPERTY UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 41(g) AND EQUITABLE PRINCIPLES**

On January 7, 2026, Immigration and Customs Enforcement agent Jonathan Ross shot and killed Renee Nicole Macklin Good ("Renee") in Minneapolis, Minnesota. At the time of the shooting, Renee was in the driver's seat of a Honda Pilot that she co-owned with her partner, Plaintiff Rebecca Good ("Becca"). Notwithstanding that video evidence showed Ross was in no danger when he opened fire at Renee, senior federal officials immediately absolved Ross of responsibility for the killing and declared there

would be no federal investigation into his conduct. Despite the lack of investigation, the federal government seized the Honda Pilot and its contents and refused access to both counsel for Becca and Renee's family, and for months to the State of Minnesota, which is investigating the shooting. To ensure that Becca and Renee's family can adequately investigate Renee's killing and pursue civil accountability, Becca now seeks return of the Honda Pilot and the personal property contained in the vehicle at the time of its seizure under Federal Rule of Criminal Procedure 41(g) and under longstanding equitable principles.

## I. Factual Background[1]

### a. The Killing of Renee Good by ICE Agent Jonathan Ross

On January 7, 2026, Becca and Renee dropped off their six-year-old son at school. As they returned home from the drop off, Renee and Becca encountered Immigration and Customs Enforcement agents who were part of Operation Metro Surge. Renee, who was driving a Honda Pilot co-owned by Becca and Renee[2] (which was also carrying their dog, Wapsie), stopped the vehicle on Portland Avenue between 33rd and 34th Street in Minneapolis. The Honda Pilot contained a variety of personal property belonging to

---

[1] Certain documents referenced herein are attached as exhibits to the Declaration of Benjamin Berkman ("Berkman Dec."), filed contemporaneously with this motion. This motion also references the Declaration of John Paolucci ("Paolucci Dec.") and the Declaration of Rebecca Good ("Good Dec."), which are likewise filed contemporaneously with this motion.

[2] *See* Berkman Dec., Ex. 1, Honda Pilot Vehicle Title; Good Dec.

Becca and Renee. *See* Good Dec. Exercising their First Amendment rights, Becca exited the vehicle and began filming ICE activity, while Renee remained in the vehicle.

Ross drove past the Honda Pilot and exited his car, already filming with his cell phone. As Ross walked by the Pilot's driver's side window, Renee said to him: "That's fine dude. I'm not mad at you. I'm not mad at any of you." Shortly thereafter, two other ICE agents stopped a pickup truck on the other side of Renee's Honda Pilot. Renee motioned for the ICE agents to go around her, saying, "just go around." Instead, the ICE agents got out of their vehicle and one attempted to open the locked driver's door of the Honda Pilot.

Meanwhile, Ross—holding his phone in his left hand—walked in front of Renee's vehicle, a few feet from the front of the car. Renee began to turn the vehicle to the right—away from Ross—and slowly drove forward. Ross was at no point in danger from the vehicle. Notwithstanding the absence of any threat, Ross drew his gun and fired at least three times at Renee. Ross fired the latter two shots into the open driver's side window of the vehicle, and he fired all of the shots as Renee drove slowly away from him.

After Ross shot Renee, her vehicle careened down the street, out of control, eventually stopping after it hit a parked car. As the car careened down the street, Ross uttered, "fucking bitch." Becca ran down the street after her car, where she found Renee with a gunshot wound to her head. Several bystanders were on the street, some of whom

filmed portions of the incident.[3] Despite knowing that Renee had been shot, neither Ross nor the other ICE agents present rendered medical aid to Renee. To the contrary, when a person on the street offered assistance, an ICE agent responded, "No, back up, now!" When the person identified themselves as a physician, the ICE agent responded, "I don't care."

An independent autopsy revealed that Renee had three gunshot wounds. One gunshot wound entered and exited Renee's left forearm without hitting bone. Another wound entered and exited Renee's right breast. A third, fatal gunshot wound entered Renee's left temple and exited the right side of Renee's head.

### b. The Federal Government Declares It Will Not Investigate the Shooting and Fails to Provide Access to Key Evidence

Immediately following the incident, top federal government officials declared that there would be no investigation into Ross's conduct. On the day of the incident, Vice President J.D. Vance declared that Ross was "protected by absolute immunity."[4] On January 13, 2026, then-Deputy Attorney General and now Acting Attorney General Todd

[3] The shooting death of Renee and the events immediately before and after the shooting were recorded at multiple angles and have been the subject of extensive media attention. For one compilation of recordings, *see* The New York Times, *Video Analysis of ICE Shooting Sheds Light on Contested Moments* (Jan. 15, 2026), *available at* https://www.nytimes.com/2026/01/15/video/ice-shooting-renee-good-minneapolis-videos.html.

[4] Devan Cole, Do ICE agents have absolute immunity? No, experts say, but it's not easy for a state to prosecute, CNN (Jan. 9, 2026), available at https://www.cnn.com/2026/01/08/politics/ice-immunity-jd-vance-minneapolis.

Blanche stated, "there is currently no basis for a criminal civil rights investigation."[5] Harmeet Dhillon, head of the DOJ Civil Rights Division, likewise informed staff that she would not consider opening an investigation into whether Ross violated federal law.[6] DOJ leadership's approach to the case prompted a mass resignation of federal prosecutors in the District of Minnesota.[7] On January 18, Blanche reaffirmed that there was no federal investigation into Ross's conduct, stating that DOJ "doesn't just stand up and investigate because some congressman thinks we would, because some governor thinks that we should. We investigate when it's appropriate to investigate. And that is not the case here. It was not the case when it happened and is not the case today."[8]

The federal government not only apparently failed to investigate Ross's killing of Renee—it refused to share key evidence, including the Honda Pilot and the personal property therein, with the State of Minnesota agencies investigating the shooting. On

---

[5] Alanna Durkin Richer and Eric Tucker, *Justice Department sees no basis for civil rights probe in Minnesota ICE shooting, official says*, ASSOCIATED PRESS (Jan. 13, 2026), available at https://apnews.com/article/justice-department-resignations-renee-good-f456dc01c7d72e15662016193b2e383e.

[6] Ernesto Londoño, *Six Prosecutors Quit Over Push to Investigate ICE Shooting Victim's Widow*, NEW YORK TIMES (Jan. 13, 2026), *available at* https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html?unlocked_article_code=1.XlA.D1bA.VwY0Q0oAOSWr&smid=url-share.

[7] *Id.*

[8] Perry Stein, *FBI opened probe on Minneapolis shooting; none exists now, Justice Dept. says*, WASHINGTON POST (Jan. 19, 2026), available at https://wapo.st/3Q0hHSG.

March 24, 2026, the State of Minnesota, the Hennepin County Attorney, and the Superintendent of the Minnesota Bureau of Criminal Apprehension filed suit against the United States Department of Justice, United States Department of Homeland Security, then-Attorney General Pamela Bondi, and then-Homeland Security Secretary Kristi Noem seeking access to the evidence concerning the shootings of Renee, Alex Pretti, and Julio Cesar Sosa-Celis. *See State of Minnesota et al v. U.S. Department of Justice et al.*, Case No. 1:26-cv-01007 (D.D.C.), ECF No. 1 ("Minn. Compl.") (Berkman Dec., Ex. 2). The complaint alleges that shortly after the shooting, federal officials seized evidence from the scene, including the Honda Pilot, shell casings, and Ross's firearm. Minn. Compl. ¶ 53.

Though the federal officials stated there would be no federal investigation into Ross's conduct, they refused to allow Minnesota investigators access to any of the evidence federal officials seized. On the evening of the shooting, the U.S. Attorney for the District of Minnesota stated that there would be no joint investigation with Minnesota authorities and no evidence sharing. *Id*. ¶ 55. Senior federal officials, including then-DHS Secretary Noem and President Trump, made public statements reinforcing that there would be no cooperation, with the President stating Minnesota officials were "crooked." *Id*. ¶ 56.

Despite the federal government's noncooperation, Minnesota officials continued their own investigation, led by the BCA and the Hennepin County Attorney's Office. *Id*. ¶ 60. Minnesota courts found probable cause to issue search warrants for evidence,

including for Becca and Renee's car, which the complaint alleged on information and belief remains shrink-wrapped and unexamined in an FBI storage facility in Brooklyn Center, Minnesota. *Id.* ¶ 61. The BCA repeatedly asked the FBI to provide access to Renee and Becca's car, but those requests were refused or ignored. *Id.* ¶ 61. The complaint indicates that most recently, on March 18, 2026, the FBI informed the BCA that DOJ and DHS had directed that all evidence related to Renee's killing be turned over only to DHS's Office of Inspector General, not to the BCA. *Id.* ¶ 62. DHS and DOJ ultimately failed to provide the state entities access to the evidence in the Good matter in response to formal *Touhy* demands, prompting the state to file suit.

The federal government has likewise failed to cooperate with Becca and Renee's family's efforts to ensure evidence is properly preserved. On January 14, 2026, counsel for Renee's family members issued a preservation notice to numerous federal entities, including the Department of Justice, Department of Homeland Security, Immigration and Customs Enforcement, and the FBI. The notices sought preservation of documents, tangible things, and electronically stored information related to the shooting. To date, counsel has received no confirmation that the recipients are in fact preserving any such evidence.

On January 17, 2026, an investigator retained by counsel for Renee's family and Becca contacted the FBI's Minneapolis division to inquire about release of the Honda Pilot. FBI Minneapolis Chief Division Counsel Special Agent Katie Morrissey stated that she would pass along the request to the FBI Command Post and the U.S. Attorney's

Office. Neither the FBI Command Post nor the U.S. Attorney's Office contacted the investigator or counsel. On February 3, 2026, counsel wrote again to the FBI, DOJ, USAO, ICE, and the Department of Homeland Security seeking access to the Honda Pilot. Counsel sent additional correspondence to the USAO, DOJ, and FBI on February 5, 2026. Counsel never received a response to the February 2026 requests. [9]

In mid-March 2026, Becca's counsel conducted additional outreach to the FBI for purposes of seeking return of the Honda Pilot. Becca's counsel reached out by phone and email to the FBI multiple times in March 2026, and in an email specifically explained that they would appreciate the opportunity to discuss the return of Becca's property. Counsel never received a response to their voicemails or emails to the FBI. After the government ignored her efforts to obtain return of her property, Becca filed this action on April 24, 2026. ECF 1.

On August 12, 2026, the government filed a motion to dismiss for mootness, asserting that the Honda Pilot had been transferred to the Minnesota Bureau of Criminal Apprehension. ECF 16. The government did not attach any affidavit, declaration, property receipt, or other evidence to that motion. *Id*. Petitioner opposed the

---

[9] Staff for counsel also submitted a Freedom of Information Act ("FOIA") request to the FBI for Jonathan Ross's communications related to the January 7 incident. Underscoring the absence of an investigation into Ross, on April 17, 2026, the FBI denied the FOIA request, but notably did not invoke the FOIA exemption for production of law enforcement records that "could reasonably be expected to interfere with enforcement proceedings." *See* 5 U.S.C. § 552(b)(7)(A). Instead, the FBI relied only on two exemptions for records whose production would constitute an "unwarranted invasion of personal privacy." *See* Berkman Dec., Ex. 3, FBI FOIA Denial (denying FOIA request based on 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C)).

government's motion. ECF 17. The government attached to its reply brief two documents: (1) an affidavit indicating that "the vehicle and its contents" were physically moved to a Minnesota BCA facility on June 29, 2026; and (2) a property receipt from that date listing only the Honda Pilot. ECF 25, 25-1. Neither the affidavit nor the property receipt identified any contents of the vehicle on the date it was allegedly moved to the BCA facility, nor did they identify any terms of the move to the BCA facility.

## II. Analysis

The federal government has repeatedly declared that it will not investigate Ross. The federal government nonethelesshas not returned the Honda Pilot to Becca, and for many months refused to allow the State of Minnesota to access the car (only apparently relenting after litigation was initiated). This dual course of action—refusing to investigate while withholding key evidence—was calculated to prevent any meaningful inquiry into the unlawful killing of a U.S. citizen. But preventing a serious investigation into gross federal misconduct is not a proper basis for the United States to maintain possession of privately owned property. To the contrary, equitable principles require this Court to exercise jurisdiction over this matter and order the government to return the Honda Pilot and the personal property therein to Becca, their rightful owner, so that she and Renee's family may adequately investigate the events of January 7 and pursue available civil remedies.

**a. The Court Should Exercise Jurisdiction Over This Matter**

Federal Rule of Criminal Procedure 41(g) states that "[a] person aggrieved by . . . the deprivation of property may move for the property's return . . . in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings."

A court may entertain a motion for return of property even where there are no criminal charges at issue. "Federal courts have recognized an independent cause of action for return of property based on the general equitable jurisdiction of the federal courts." *Black Hills Inst. of Geological Rsch. v. U.S. Dep't of Just.*, 967 F.2d 1237, 1239 (8th Cir. 1992). Such a suit is "properly considered a suit in equity." *Id*. In circumstances where the legality of the seizure is not challenged, courts consider several factors in determining whether to assert equitable jurisdiction: (1) the reasonableness of the continued seizure; (2) whether the party seeking return has an individual interest in and need for the property; (3) whether the party has an adequate remedy at law; and (4) whether the property would be irreparably damaged by a failure to return. *Id*. at 1239-40. Each of these factors strongly favors assertion of jurisdiction.

First, the federal government's continued possession of the vehicle is unreasonable given its affirmative representations that it is not investigating Ross's conduct. To the contrary, the federal government's continued possession of the vehicle will have the

effect of frustrating any meaningful inquiry into Renee's killer. The vehicle represents core evidence in any inquiry into the shooting—for instance, damage to the car, the location and entry angle of bullet holes, and the location of blood spatter and other biological evidence is highly relevant in assessing Ross's positioning during each shot. It is unreasonable for the government to at once decline to investigate and at the same time deprive Becca and, for months, the State of Minnesota access to the evidence necessary to investigate.

The Eighth Circuit recently explained that the "reasonableness of holding onto seized property is not dependent on the government's belief it has 'an ongoing evidentiary need' or the statute of limitations for the offense under investigation, as that might 'in many cases impose an impermissible burden on a citizen whose property is potential evidence' and be 'tantamount to a forfeiture without the procedures required by statute and by due process.'" *Lindell v. United States*, 82 F. 4th 614, 621 (8th Cir. 2023). Put differently, the hollow assertion of an evidentiary need is not enough for the government's continued seizure to be reasonable. In *Lindell*, the court remanded for a hearing on return of the movant's cell phone and data *even where* that evidence was implicated in an ongoing investigation. *Id*. at 622. Here, though, the government's retention of Becca's property is doubly egregious because the government has expressly disclaimed any evidentiary need for the Honda Pilot and the personal property therein:

the government has repeatedly disavowed any investigation into Ross's conduct, rendering any continued seizure of the vehicle and its contents unreasonable.[10]

Second, for the same reasons, Becca has an individual interest in and need for the property. Becca is the legal owner of the property and thus has an individual interest in it. *See* Ex. 1; *see also* Good Dec. Becca, as Renee's partner and loved one, has a need for the vehicle and the property therein at time of seizure so that she and Renee's family, may timely investigate and pursue civil accountability for Ross's conduct. To that end, Becca submitted an administrative claim (SF-95) to ICE and other federal agencies for the injuries that she suffered as a result of Ross's conduct, and has now filed suit against the United States and individual actors responsible for her injuries. *See Ganger et al. v. United States*, Case No. 0:26-cv-04230 (D. Minn.); *Ganger et al. v. Ross et al.*, Case No. 0:26-cv-04231 (D. Minn.). Becca would likewise cooperate with the search warrant the State of Minnesota obtained for the vehicle in its investigation. Becca's need for return of the vehicle is exceptionally strong. An armed, masked agent of the federal government killed Becca's partner at a moment when Renee posed no meaningful threat to him. Such an apparent gross abuse of power by a federal official mandates a thorough and complete inquiry into his conduct. Yet Becca—and the public writ large, to whom the federal government is answerable—were denied that inquiry by the government's

[10] For reasons discussed in Section II.b, *infra*, even if the federal government had an active investigation into Ross—which it has repeatedly disclaimed—maintaining possession of the Honda Pilot and the personal property therein in perpetuity would not be reasonable given the alternatives available for preservation of evidence.

simultaneous refusal to investigate and refusal to release the key evidence. *See Black Hills Institute*, 967 F.2d at 1237 (plaintiffs demonstrated an interest in and need for the seized fossils where they "ha[d] an interest in preserving the fossil and studying it" and where the plaintiffs had "made the fossil available to the public and scientific community for display and research").

Third, Becca has no adequate remedy at law. While Becca may have civil legal remedies arising from Ross and other federal actors' conduct on January 7, 2026, those remedies are not an adequate substitute for access to the vehicle for multiple reasons. First, as discussed in greater detail below, there are serious concerns that permitting the government to retain possession of the Honda Pilot will allow key evidence to degrade. Second, in this instance, seeking the truth about what happened on January 7, 2026 is a matter of national importance and public accountability irrespective of the legal remedies available to Becca. There has been truly exceptional public interest in Renee's killing, in which a mother of three was killed by a federal agent amid a broader pattern of excessive force deployed during immigration enforcement operations. If the public's interest in dinosaur bones in *Black Hills Institute* warranted the return of property, *see* 967 F.2d at 1237, so too must the demand for a meaningful accounting of federal brutality here. Indeed, the State of Minnesota sought access to the vehicle to conduct that accounting—which the federal government denied for many months.

Fourth, Becca will be irreparably damaged by the government's continued possession of the vehicle and personal property therein. Becca and Renee's family need

timely access to the Honda Pilot and the personal property therein so that they may conduct a meaningful investigation of the shooting, in part to support potential civil accountability. Ross shot Renee at least three times while she was in the driver's seat of the vehicle. The vehicle and some of the personal property therein thus contains extensive blood spatter and other evidence that may continue to degrade with each passing day. *See* Paolucci Dec.; *see also Black Hills Institute*, 967 F.2d at 1240 (finding adequacy of remedy at law and irreparable damage factors favored movant where "the fossil continues to suffer damage as the legal imbroglio surrounding it untangles"). For example, blood on surfaces in the vehicle can become dislodged or "flake off" of those surfaces, such that a surface that was originally bloodstained may later appear to be void of blood (or vice versa). Paolucci Dec., ¶ 10. Vehicle tires can deflate over time, affecting the accuracy of reconstructed bullet trajectories, especially if tire pressure was not recorded contemporaneous to the incident. *Id*. ¶ 11. And movement of the vehicle and environmental conditions can cause radial fractures in the vehicle's glass to propagate and no longer be representative of their condition at the time the ballistic damage occurred. *Id*. ¶ 12. Given the federal government's apparent disinterest in investigating Ross's conduct, Becca and the public can have few assurances that the government is taking or would take steps to appropriately preserve the evidence in its possession.

Indeed, the federal government has likely already mishandled the evidence at issue. Public reporting indicates that immediately after the shooting, a federal prosecutor

in Minnesota sought a search warrant for the Honda Pilot for a civil rights investigation into Ross's use of force. But as FBI agents prepared to execute the warrant to document blood spatter and bullet holes in the Honda Pilot, they were ordered to stop by senior FBI officials, including Director Kash Patel. The senior officials were concerned that pursuing a civil rights investigation would contradict the President's false claims that Renee "violently, willfully, and viciously ran over the ICE officer" who killed her.[11] Becca will suffer irreparable harm if the Honda Pilot and the personal property therein remains in possession of a federal apparatus that would choose to spoil key evidence rather than upset a political narrative.

Nor does the apparent belated transfer of the vehicle to the BCA obviate petitioner's concerns. Certainly, petitioner is heartened to the extent the BCA is evaluating the Honda Pilot as part of an investigation into the conduct of Ross and other federal agents on January 7. But the information provided by the government is insufficient to establish that it no longer possesses, either physically or constructively, the property subject to this petition. While the affidavit provided by the government refers to the vehicle and its contents, it does not describe what contents were transferred to the BCA. It is not clear, even accepting the government's affidavit, if the contents transferred to the BCA on June 29, 2026 included all of the personal property seized

---

[11] Ernesto Londoño, *Prosecutors Began Investigating Renee Good's Killing. Washington Told Them to Stop.*, NEW YORK TIMES (Feb. 7, 2026), *available at https://www.nytimes.com/2026/02/07/us/renee-good-investigation-minnesota-trump.html?unlocked_article_code=1.X1A.bdhX.GrFlLPHcuuTG&smid=url-share.*

inside the vehicle on January 7. The government did not provide an inventory or any other accounting of the personal property as it was received on January 7 or as it was transferred on June 29.

Nor has the government provided any information about the terms of the move of the vehicle to the BCA facility. The government has not provided any evidence relating to any agreement or arrangement with the BCA relating to the vehicle or the property; if the government maintains control over the vehicle or the property because it is conducting a joint investigation or analysis with BCA; if the government maintained a right or intention to repossess the vehicle or the property; if the movement of the vehicle or the property was in any way conditioned; or if, instead, the government fully relinquished the vehicle and the property to the BCA, reserving no rights in the vehicle or property whatsoever. All the government has said is that the vehicle and its contents were physically moved to a BCA facility; it has said nothing from which petitioner can discern whether the government maintains actual possession, constructive possession, or control of the property. *See, e.g.*, *United States v. Story*, 170 F. Supp. 2d 863, 866 (D. Minn. 2001) (describing circumstances in which then-Rule 41(e) could require return of "items seized by state officials" where the United States "actually possesses the property or constructively possesses the property").

Each factor favors the court's exercise of equitable jurisdiction over this matter.

**b. The Court Should Order Return of Ms. Good's Property**

The Court should exercise its jurisdiction to order that defendants return the Honda Pilot and the personal property therein at the time of seizure to Becca. Indeed, the same reasons favoring exercise of jurisdiction overwhelmingly favor ordering the property returned to Becca. The proper inquiry "balance[s] the government's interest in retaining [the seized property] against [the movant's] right to get the property back," with the recognition that the property owner is "to be considered an innocent bystander." *Lindell*, 82 F.4th at 622; *see also Black Hills Institute*, 967 F.2d at 1240 ("[W]hen the owner of seized property seeks injunctive relief for the return of property while the case remains in the investigative stage (i.e. before criminal charges are brought), the district court must also balance the government's interest in retaining the property against the owner's right to get it back."). "When the government's interest in retaining the property is merely to keep it as evidence, the court should consider whether this purpose would be equally well served by the alternatives to holding the (evidence) itself." *Black Hills Institute*, 967 F.2d at 1240. "For instance, if a robber runs from a bank with stolen money and stumbles into a car, the government may lift fingerprints from the car, photograph it, or otherwise preserve evidence. But they may not in all cases insist on holding the car itself as evidence to be presented to the jury." *Id*.

Of course, in this case, the court need not even reach the question of whether alternatives are available to continued federal seizure of the Honda Pilot, because the federal government has disclaimed any purported need to "keep" the property "as evidence." *Black Hills Institute*, 967 F.2d at 1240. The government has expressly

disavowed any evidentiary need for the Honda Pilot by willfully declining to investigate Ross. Where "the property in question is no longer needed for evidentiary purposes . . . because . . . the government has abandoned its investigation," then "[t]he person from whom the property is seized is presumed to have a right to its return." *United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987). In the absence of "ongoing proceedings," it is "the government's burden to show that retention is reasonable by demonstrating that the property is contraband or that there is a specific nexus between the seized property and [a] continuing criminal investigation. A blanket assertion cannot satisfy that burden." *United States v. Silva*, 26 F. App'x 544, 547–48 (7th Cir. 2001) (cleaned up). Here, the government's disavowal of a criminal investigation into Ross gives Becca a presumptive right to return of the Honda Pilot and the personal property therein. In the absence of an investigation into Ross, the government has *no* interest in maintaining possession of the property. Nor does the federal government have any "cognizable claim of ownership or right to possession adverse to that of the movant," such that it could legitimately retain possession of the property. *United States v. Chambers*, 192 F.3d 374, 377 (3d Cir. 1999).

By contrast, Becca has a compelling interest in return of the property. Both Becca and the public writ large are in search of complete and accurate information about what happened on January 7, 2026. As explained above, Becca is the rightful owner of the Honda Pilot. The Honda Pilot is an essential piece of evidence related to a masked, armed agent of the federal government killing a U.S. citizen and mother of three who posed no meaningful threat to him or anyone else. The federal government simultaneously declined

to investigate Renee's killer and deprived both Becca and, for many months, state authorities access to key evidence needed in their own inquiries—inquiries that are important both for public accountability and for Becca's pursuit of civil claims. And, as discussed above, the federal government withheld evidence in a manner calculated to spoil it.

Moreover, even if the government were investigating Ross, continued possession of the property in perpetuity is unreasonable in light of "the alternatives to holding the (evidence) itself." *Black Hills Institute*, 967 F.2d at 1240. The federal government hseized the property on January 7 and has had many months todocument, study, and test any part of the property. Instead, by all accounts, the government allowed the vehicle to sit shrink-wrapped until litigation forced its hand and it allowed the BCA some degree of access to the vehicle.. If the federal government wished to obtain and preserve evidence from the vehicle, it has had ample opportunity to do so. Its calculated decision not to do so is not a basis for seizing Becca's property in perpetuity.

Moreover, the evidence can be adequately preserved even if the property itself is outside of federal control. To the extent the government wanted to thoroughly document and test any part of the vehicle or its contents, nothing stopped it from doing so other than DOJ leadership's decision to succumb to political whims. Return of the car to Becca does not serve as a barrier to the federal government obtaining any available evidence contained in or on the vehicle. Moreover, as noted above, both Becca and the State of Minnesota sought access to the Honda Pilot precisely for the purpose of properly obtaining and

documenting evidence contained in the vehicle for use in potential legal proceedings. *See* Minn. Compl. Becca and the State are accordingly incentivized to handle the vehicle with the utmost care to ensure maximum evidentiary value. The Minnesota BCA is a sophisticated law enforcement agency that regularly handles sensitive physical evidence in the course of its work. As noted above, petitioner is heartened that the BCA has had an apparent opportunity to examine the vehicle. But to the extent the property subject to this petition remains in the federal government's possession or control, Plaintiff's concerns are not obviated. To date, the government's scant evidentiary showing provides little basis to believe (1) that it has transferred all of the property seized in the vehicle on January 7 to the BCA; and (2) that it has fully divested itself of possession or control of the vehicle and personal property and has no intent to repossess it.[12]

Put differently, the equities break down like this: the government has had ample opportunity to obtain whatever evidence it desires from the vehicle and the property therein. It has by all accounts declined that opportunity. Becca and, until recently, the State of Minnesota did not have an opportunity to examine the vehicle and its contents to ensure that there is a complete and accurate public accounting of Renee's killing. Ordering return of the vehicle to Becca does not deprive the government of any evidence in an (apparently non-existent) inquiry into Ross. But allowing the government to maintain

[12] Petitioner does not seek an order requiring the BCA to relinquish any property to petitioner. Petitioner seeks relief to the extent the property remains in the federal government's possession or control.

possession of the Honda Pilot and the property therein does deprive Becca and the public writ large of a complete accounting of a killing committed by federal agent.

That accounting—one independent of the federal government—is unfortunately necessary given the tenor the federal government has taken in this matter. Almost immediately after the shooting, the President falsely declared that Renee "violently, willfully, and viciously ran over the ICE officer" who killed her, while then-Secretary of Homeland Security Kristi Noem labeled Renee a "domestic terrorist."[13] Every subsequent step taken by the federal government since the President's initial reaction has been in service of supporting that uninformed and false narrative. Even if the federal government suddenly reverses course and declares that it *is* investigating Ross, the public cannot have faith that it is doing so in a manner that is fair, complete, and independent of political whims. At a minimum, the equities require that the vehicle and its contents be returned to Becca so that—*in addition to* the federal government, if it so chooses, and the State of Minnesota—Becca and Renee's family can conduct meaningful and searching inquiries that shed light on this matter of enormous public concern.

## III. Conclusion and Request for Relief

The Court should exercise jurisdiction over this matter and order that defendants return the Honda Pilot and the personal property inside the vehicle when it was seized to

---

[13] See Anushka Patil, *Trump Calls Renee Good's Killing a 'Tragedy' and Says ICE Agents Will Make Mistakes,* THE NEW YORK TIMES (Jan. 20, 2026), available at https://www.nytimes.com/2026/01/20/us/politics/trump-renee-good-ice-shooting.html?unlocked_article_code=1.YVA.-RZP.zkCyNz0L5bYZ&smid=url-share.

Becca. Federal Rule of Criminal Procedure 41(g) provides that the "the court must receive evidence on any factual issue necessary to decide the motion." Accordingly, Plaintiff requests a hearing to determine any factual issues necessary to decide the motion.

Dated: October 8, 2026

Respectfully Submitted,

*/s/ Benjamin Berkman*

Antonio M. Romanucci (pro hac vice)
Sarah Raisch (pro hac vice)
Benjamin Berkman (pro hac vice)
ROMANUCCI & BLANDIN, LLC
321 N Clark St., Suite 900
Chicago, IL 60654
P: (312) 458-1000
F: (312 458-1004
aromanucci@rblaw.net
sraisch@rblaw.net
bberkman@rblaw.net

Kevin Riach
THE LAW OFFICE OF KEVIN C. RIACH, PLLC
125 Main St. SE, Suite 339
Minneapolis, MN 55414
(612) 203-8555
kevin@riachdefense.com

*Attorneys for Plaintiff*